UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 06-21633-CIV-COOKE/BROWN

**ADHAM ADMIN HASSOUN,**

    Petitioner,

vs.

**FEDERAL BUREAU OF PRISONS and
HARLEY G. LAPPIN, Director, Federal
Bureau of Prisons, in his official capacity,**

    Respondents.

_____/

**CORRECTED ORDER DENYING PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION**

    **THIS CAUSE** came before the Court upon the Petitioner's Motion for Preliminary Injunction [D.E. 10], filed July 21, 2006, requesting that this Court direct the Respondents to immediately place Hassoun in the general population of the Bureau of Prisons ("BOP") and entitle him access to all of the privileges afforded the general population.

    **ORDERED AND ADJUDGED** that the Petitioner's Motion for Preliminary Injunction is **DENIED.**

    **I.**    **BACKGROUND**

    On June 27, 2006, Hassoun filed a Petition pursuant to Title 28, U.S.C. §§ 2241, 2242, seeking preliminary and permanent injunctive relief prohibiting further pretrial detention of Hassoun in solitary confinement. [D.E. 1]. Petitioner Hassoun is currently a pretrial detainee in Southern District of Florida case No. 04-CR-60001-Cooke ("Criminal Case"), before this Court, and has been held for the past two (2) years in indefinite solitary confinement in the custody of the Respondents,

Federal Bureau of Prisons, and Harley G. Lappin, Director, Federal Bureau of Prisons ("BOP"), at the Federal Detention Center at 33 N.E. Fourth Street, Miami, Florida 33132 ("FDC-Miami").

To better understand Hassoun's current detainment predicament, it is imperative to briefly review the course of events that preceded Hassoun's ultimate pretrial detention at FDC-Miami's Segregated Housing Unit ("SHU"). On June 12, 2002, the Immigration and Naturalization Service ("INS") detained Hassoun for allegedly being an illegal immigrant. See Petitioner's Motion for Preliminary Injunction, ¶4. Hassoun remained in INS custody until January 2004, being held in the general population at jail facilities in Fort Lauderdale, Florida and at the Krome Detention Center in Miami, Florida. While Petitioner's challenge to his INS deportation proceedings was pending, on January 8, 2004, the Grand Jury indicted Hassoun, charging him with federal firearms violations, in contravention of Title 18, United States Code, Section 922(g)(5)(B).[1]

Subsequently, Hassoun was transferred from INS to BOP custody on January 23, 2004, and was placed in the SHU facility at FDC-Miami. On February 24, 2004, following a hearing on Hassoun's motion for bond, the Magistrate Judge found that no condition or combination of

---

[1] Section 922(g)(5)(B) makes it unlawful for an alien admitted into the United States under a nonimmigrant visa to possess any firearm or ammunition. In pertinent part, the statutory provision provides that:

    (g) It shall be unlawful for any person–
                         ***
        (5) who, being an alien–
                         ***
            (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26))); to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

conditions would reasonably assure Hassoun's appearance at future hearings.[2]  From February 2004 through July 2004 Hassoun was placed in the general population of the Palm Beach County Jail while awaiting arraignment.  On July 15, 2004, Hassoun was transported to FDC-Miami and returned to the SHU facility.  At that point, Lieutenant G. Clark, BOP, issued an Administrative Detention Order specifying that Hassoun was to be placed in SHU due to his "ties to terrorist groups" which posed a "possible threat to the overall security of the institution." See Exhibit #9, attached to Respondents' Notice of Filing and Exhibits, Administrative Detention Order.  The Order additionally noted that continued placement in the general population was unfeasible because such detention would pose a "serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution."  Id.

On February 27, 2005, Hassoun filed a Request for Administrative Remedy with the Warden at FDC-Miami, seeking placement in the general population.  This request was denied on March 24, 2005. An Appeal to the Regional Director followed on April 6, 2005.  Hassoun additionally filed a

---

[2]  Specifically, the Magistrate Judge found that:

[T]he defendant presents a risk of flight for several reasons: (1) he is a Palestinian with no specific country of citizenship; (2) he has a sister residing in Sweden and three brothers residing in the United Arab Emirates; (3) while he has been in custody, he has told Government agents that he wants to leave the United States and go to the United Arab Emirates, New Zealand, or Kuwait; (4) the strength of the Government's case; and (5) while the defendant may only be facing a sentence of ten (10) to sixteen (16) months for the present charges, the prospect of a superseding indictment means that the defendant will be likely facing a greater sentence, thereby providing the Defendant with a greater incentive to flee.

See Exhibit #3, attached to Respondents' Notice of Filing and Exhibits, Pretrial Detention Order.

Indeed, four additional Superseding Indictments were filed in this case charging Defendant Hassoun and his co-defendants with numerous other crimes.

second Administrative Appeal to the Regional Director on April 9, 2005.  Both requests were denied. The Regional Director's Response to the April 9, 2005 Appeal provided that Hassoun was placed in SHU due to "security concerns."  See Exhibit #14, attached to Respondents' Notice of Filing and Exhibits, BOP Response. Hassoun filed Central Office Administrative Appeals in response to both of the Regional Director decisions on June 13, 2005 and August 24, 2005, and both were denied. See Exhibits #17 and 20, attached to Respondents' Notice of Filing and Exhibits, BOP Responses. The June 13 appeal was denied because it was not filed in a timely manner. The Central Office denied the August 24 appeal after determining that "[Hassoun's] presence in the general population would pose a threat to the security and the orderly operation of the prison environment." See Exhibit #20, attached to Respondents' Notice of Filing and Exhibits, BOP Response.

On September 21, 2005, this Court entered an Order in the criminal proceedings denying, without prejudice, Petitioner's Joint Motion to Terminate Defendant's Placement in Administrative Detention.  See Exhibit #21, attached to Respondents' Notice of Filing and Exhibits, Court Order. Subsequently, Hassoun filed his petition for Writ of Habeas Corpus relief, and his Motion for Preliminary Injunction which echoes the arguments raised in the Habeas petition.

## II.   LEGAL STANDARD

### A.   PRELIMINARY INJUNCTION

As articulated by the Eleventh Circuit in Carillon Importers, Ltd. v. Frank Pesce Int'l Group Ltd., 112 F.3d 1125 (11th Cir. 1997), for a District Court to grant a motion for preliminary injunction, it must first find that the movant has satisfied four prerequisites: "(1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant is greater than any damage the proposed injunction

may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest." See Carillon, 112 F.3d at 1126 (citations omitted). Furthermore, preliminary injunctive relief is a "drastic remedy," and the movant bears the burden of clearly establishing each of the four prongs. Café 207, Inc. v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993).

### B. PRETRIAL DETAINMENT

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, the proper inquiry is whether those conditions amount to punishment of the detainee. See Bell v. Wolfish, 441 U.S. 520, 535 (1979)  The Due Process Clause dictates that a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. Id.

Clearly, then, the pivotal inquiry becomes a critical analysis of precisely what constitutes "punishment" of the detainee. In, Kennedy v. Mendoza-Martinez, the Court addressed this query and held that when considering whether governmental action amounts to punishment, one must consider "whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment -- retribution and deterrence, whether the behavior to which it applies is already a crime,  whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned." See  Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169 (1963) (footnotes omitted). Additionally, it is important to note that the Court in Kennedy specified that these questions need not all be answered in the same way and noted that they "may often point in differing directions." Id.

Absent a showing of an expressed intent to punish on the part of detention facility officials,

the determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Id. at 168-69. *Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."* Bell, 441 U.S. at 538-39 (emphasis added). Conversely, the Court may infer that the purpose of the governmental action is indeed unconstitutional "punishment" if the restriction or condition is "arbitrary or purposeless" and not reasonably related to a legitimate goal. Id. However, the Court cautions that when conducting this delicate analysis, "courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Id.

The Government has legitimate interests that stem from its need to manage the prison facility in a safe, orderly and functional manner. These operational concerns may require administrative measures that exceed those that are, strictly speaking, necessary to ensure the detainee's attendance at trial. Id. at 540. "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." Id. Thus, effective and safe prison management is a "valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." Id.

In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, the Court has stressed, time and time again that "[such] considerations are peculiarly within the province

and professional expertise of corrections officials, and, in the absence of *substantial evidence* in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, 417 U.S. 817, 827 (1974) (emphasis added). While the court might disagree with the means chosen by prison officials to effectuate those interests, it should not "second-guess the expert administrators on matters on which they are better informed . . . . Concern with minutiae of prison administration can only distract the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?" Bell, 441 U.S. at 545 (citations omitted) (noting that the "wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government"). Id. at 562.

Assessing the constitutionality of the particular condition or restriction is the indispensable overarching inquiry that the Court must address. However, the steadfast deference allotted to prison administration decisions is so substantial that at times even constitutional deprivations may be justified. The Court has held that under certain circumstances "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Id. at 546-47. Even when an institutional restriction "infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 129 (1977); Solomon v. Zant, 888 F.2d 1579 (11th Cir. 1989) (noting that "if a prison's practice or policy is 'reasonably related to legitimate penological interests,' the policy will be upheld as a valid restriction on the inmates constitutional rights") (citations omitted).

### III.    ANALYSIS

In order for this Court to grant Petitioner's motion for preliminary injunction, the four prerequisites articulated in Carillon must first be satisfied. The Court finds that Petitioner has not exhibited a substantial likelihood of success on the merits, and thus, has failed to adequately establish Carillon's first prong.

Petitioner does not present sufficient evidence to support the claim that his detention in SHU amounts to unconstitutional punishment. Petitioner contends that the length of his stay in administrative detention, in conjunction with various confounding factors directly attributable to his detention, render his placement in SHU unconstitutional "punishment." Petitioner argues that SHU policies pertaining to escorting counsel in and out of the facility, have placed a significant hardship on defense counsel. Specifically, Petitioner asserts that these policies have limited counsels' ability to visit him, thus reducing the quality and productivity of the time available during visits. Petitioner also claims that he has been subjected to harassing searches by some officers where legal papers containing attorney-client and/or work product protected information have been removed, lost, disposed of or destroyed. Additionally, Petitioner maintains that the cumulative effect of the laundry list of privileges denied him, yet afforded the general population, amounts to unconstitutional "punishment." The list of rights allegedly denied Petitioner include: "[weekly contact] with social visitors, normal telephone privileges, normal comissary, timely medical and dental treatment, normal recreation, . . . the right to engage in communal religious prayers, . . . access to religious reading material, and regular access to traditional food that are part of the Islamic religious tradition . . . ." See Petitioner's Motion for Preliminary Injunction, ¶19.   Thus, Petitioner argues that based on the

circumstances of this case, enduring these deprivations during his detainment in SHU amounts to unconstitutional "punishment." Consequently, Petitioner requests that this Court grant him a Preliminary Injunction directing the Respondents to immediately place him in the BOP's general population and entitle him access to all of the privileges afforded the prisoners therein.

In the instant action, no showing was made suggesting an express intent to punish on the part of prison officials. While Petitioner suggests that he has been subjected to harassing searches, he provides no evidence, aside from bald accusations, to suggest that these searches were maliciously conducted. Additionally, Petitioner claims that his legal documents were "removed, lost, disposed of or destroyed" during these searches. However, again Petitioner provides no evidence to support this claim and fails to identify when these allegedly illicit searches were conducted or which officers conducted them.[3] Petitioner's various other grievances address conditions that are innate to administrative detention. Standing alone, this Court does not find that these conditions amount to unconstitutional "punishment." "Restraints that are reasonably related to the institution's interest in maintaining jail security, do not, without more, constitute unconstitutional punishment, even if they are discomforting and restrictions that the detainee would not have experienced had he been released while awaiting trial." See Bell, 441 U.S. at 540.

Thus, to assess whether the conditions of Hassoun's detention stand up to constitutional scrutiny, this Court must determine whether the BOP's decision was driven by alternative legitimate governmental interests. If so, the decision in favor of administrative detention will be upheld as a justifiable determination compelled by a valid governmental purpose. However, if the decision is

---

[3]During the Criminal Case before this Court, this Court established that prison officials are to notify the Petitioner if at any time his cell is searched outside of his presence.

"arbitrary or purposeless," and does not serve to further a legitimate penological goal, this Court is obligated to strike it down as a form of unconstitutional "punishment." Id. at 539.

The BOP has determined that the Petitioner poses a serious threat to the safety of himself, the staff, and other inmates in the prison facility. In reaching this assessment, the FDC considered the severe terrorism-related charges that Petitioner is facing, as well as his ties to radical Islamic organizations, including the Islamic Group of Egypt and al Qaeda. As specified in Associate Warden Wombacher's Declaration, it is not only the severity of the offenses that was considered, but also the nature of the crimes charged. Hassoun is charged with crimes related to his "recruitment of others to commit violent acts." See Associate Warden Wombacher's Declaration. Specifically, as delineated in the numerous indictments, Hassoun is being charged based on his involvement in recruiting "mujahideen warriors who would engage in violent jihad."[4] See Fifth Superseding Indictment. It is not unreasonable for the FDC to believe that an individual charged with this type of offense may have a greater propensity to use the prison environment as a breeding ground to recruit followers. Particularly, the recalcitrant and rebellious proclivities of many prison inmates make them prime targets for an experienced recruiter compelling them to act out against the government responsible for their incarceration.

Additionally, the BOP has unique knowledge of the prison's resources, strengths and weaknesses. Indeed, the Court has frequently noted that "because the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems."

---

[4] As used in the Fifth superseding indictment, the terms "jihad" or "violent jihad" encompass "planning, preparing for, and engaging in, acts of physical violence, including murder, maiming, kidnapping, and hostage taking." See Fifth Superseding Indictment, Page 2. Mujahideen denotes "warriors engaged in violent jihad." Id.

Bell, 441 U.S. at 548. These issues generally require practical solutions administered by individuals on the ground who are better familiarized with the prison system, and are rarely susceptible to resolution by decree. Many of the arguments in favor of administrative detention set forth by Respondent BOP adequately reflect this need for pragmatic solutions. BOP officials have determined that there is a compelling need for staff to closely monitor the Petitioner's telephone calls, mail, movement and contacts. These needs are undisputedly linked to the BOP's concerns regarding Hassoun's ties to dangerous individuals outside of the prison gates, as well as potential recruits within the prison walls. The transient population of the general population would make it considerably less difficult for Hassoun to relay messages and communicate with individuals both in and out of prison. This greater ease of communication would render the BOP's monitoring procedures far less effective. Likewise, the Respondents address the functional concerns presented were Petitioner to be afforded with the same telephone and mail privileges as the general population:

> In general population, although there is the ability to monitor an inmate's telephone calls, there is also the opportunity for an inmate to use another inmate's telephone pin to place calls. Many inmates purchase another inmate's telephone pin number in order to place a call that may go undetected. Even if the prison officials monitored every call the Petitioner made using his pin number, there is no assurance that he could not place calls using another inmate's telephone pin number which could go unmonitored . . . . The same holds true for mail. Although there are procedures in place to monitor the Petitioner's mail, it would not be impossible for him to circumvent the mailing procedures and send mail out or receive mail through another inmate. It is impossible to review every single letter sent to inmates within the general population. For these reasons, the only way staff can monitor the Petitioner's telephone calls mail and contact is through closer supervision. This is achieved through his placement in administrative detention.

Respondents' Consolidated Reply [D.E. 13]

Practical concerns, such as those enumerated in the BOP's Response, require measured, effective solutions. In this case, the BOP believed that Hassoun should be placed in administrative

detention to avoid what they perceived as a substantial threat to the safety of staff, inmates and the orderly running of the facility in a secure manner. The reasons provided by the BOP for the placement appear to be driven by pragmatism, and not the desire to punish Hassoun. Whether or not this solution is the most effective means of achieving the desired result is not an inquiry within the scope of this Court's review. Bell, 441 U.S. at 545 (noting that "[t]he court might disagree with the choice of means to effectuate [the prison administrations security] interests, but it should not second guess the expert administrators on matters on which they are better informed") (citation omitted). The BOP has made a sufficient showing that their decision in favor of administrative detention is reasonably related to a legitimate governmental objective.

Furthermore, this Court does not believe that the BOP's actions constitute an excessive or exaggerated response. The BOP made a determination that Hassoun posed a security threat to the safety of other prisoners and staff. Additionally, the BOP determined that the security concerns were further substantiated due to Petitioner's ability, while in the general population, to more freely communicate with individuals outside of prison. Based on these very legitimate concerns, the BOP decided to relegate Hassoun to administrative detention. Indeed, the regulation that permits BOP officials to place an individual in administrative detention, anticipates precisely this type of exigency. 28 C.F.R. §541.22(a)(3) allows the BOP to place an individual in administrative detention "when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution." This Court is convinced that the concerns that 28 C.F.R. §541.22(a)(3) was created to address, were logically implicated in this case. Accordingly, this Court believes that the BOP's placement of Hassoun in administrative detention was a justifiable resolution that bears a reasonable relation to a very legitimate penological

interest, namely, the safety of prisoners and BOP personnel.

Additionally, this Court is not persuaded by Petitioner's repeated contentions regarding Hassoun's abstainment from illegal activity subsequent to his incarceration.[5] Petitioner does not point to any authority indicating that administrative detention based on security concerns must necessarily be premised on post-incarceration behavior. This Court does not believe that to be the appropriate standard. Wide ranging deference is granted to BOP officials to make decisions that ensure a safe and secure prison environment. It would be disingenuous and counter-intuitive to require these officials to turn a blind eye to crucial, relevant information merely because it comes from outside of the prison walls. BOP officials must be entrusted to use all of the facts and information available to them to make reasonable and informed decisions that will ensure prison safety and security.

Furthermore, in Associate Warden Wombacher's Supplemental Declaration, Wombacher discusses a July 2006 letter from a former co-detainee demonstrating that, during 2005, Hassoun spoke about his "love for al Qaeda Islamic extremists." See Supplemental Declaration of Doug Wombacher. Additionally, the letter specified that Hassoun attempted to circumvent BOP security measures in an effort to recruit inmates (including the letter's author) "to fight for him." Id. While this Court is mindful of the inherent credibility concerns present in a co-detainee's letter of this sort,

---

[5]See Petitioner's Motion for Preliminary Injunction at 14 (noting that "Hassoun has not been accused of engaging in any illegal activities after his arrest and detention"); Petitioner's Reply to Respondent's Consolidated Response at ¶¶ 1 and 4 (arguing that "[n]one of the charges in the series of indictments that the Government and the Warden cite as justification for placement of Hassoun in SHU occurred after [INS detainment]" and that "he has never used the telephone or other forms of communication while in custody in general population, in INS Custody, or during a legal or social visit (either at Krome Detention Center or any county jail) to engage in any act charged in the various indictments or otherwise threaten the security of the BOP").

it is still evidence of the potential for Hassoun to engage in illicit and dangerous behavior while placed in the general population. Prison officials must be free to assess the credibility of this type of evidence, and make determinations based on its veracity. The letter, in conjunction with the other evidence in favor of administrative detention, lends further credence to the BOP's assertion that their decision to place and keep Hassoun in SHU was reasonably informed and intended to further legitimate penological goals. While this Court makes no finding regarding the probative value of this particular co-detainee's letter, it acknowledges the persuasive import evidence of this nature may reasonably have on prison administrators. Additionally, Respondent fails to consider that perhaps the dearth of evidence of illegal activity occurring after Petitioner's incarceration is directly attributable to the effective implementation of the BOP's administrative detention measures.

Lastly, while this Court appreciates the substantial deference afforded the BOP in administering their duties, it is also mindful that at a certain point, this deference will need to bow to constitutional considerations. As noted by the Court in Turner v. Safely, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." See Turner v. Safely, 482 U.S. 78, 84 (1987). However, the Court has adopted a deferential standard for determining whether a prison regulation impinges on an inmates constitutional rights. Id. at 95 (noting that "a prison inmate retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system"); Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000) (stating that "[a] prison regulation, even though it infringes the inmates constitutional rights, is an actionable violation only if the regulation is unreasonable"); Pope v. Hightower, 101 F.3d 1382, 1384-85 (11th Cir. 1996) ("When considering a constitutional challenge to prison regulations, courts are obliged to ensure that the restriction bears

a reasonable relation to a legitimate penological objective. If such a relation exists, the inquiry is at an end. Whether the restriction seems reasonable in any more general sense presents a question outside the purview of the federal judiciary.").

The *sine qua non* of this inquiry is the reasonableness and legitimacy of the governmental measures. While this Court finds the BOP's objective reasonable, it stresses that the BOP must work within the confines of their administrative detention decision to provide Hassoun with all the constitutional rights that are allotted to him. If retracting a constitutional right is not reasonably related to a legitimate penological objective, the retraction becomes unconstitutional. Thus, the BOP must be mindful that although its decision in favor of administrative detention may be sound, it is still incumbent upon BOP officials to ensure that all constitutional privileges which comport with this decision must be granted to Hassoun. Depriving an inmate of constitutional privileges unjustly should never be written off as a "cost of doing business." It is imperative that the BOP are vigilant to ensure that Petitioner's sacred constitutional rights, specifically his right to access counsel and to procedural due process, do not fall through the cracks of prison walls due to double speak and bureaucratic red tape.

This Court requests that both parties acknowledge the unique nature of this trial, and the inherent absurdity in treating this case like any other. By the Government's own admission, this case involves thousands upon thousands of documents that need to be reviewed by both defense counsel and Petitioner. As the January trial date looms ever more imminently near, it is imperative that the BOP do everything within its power to allow defense counsel to access Petitioner in the most expeditious and efficient means possible. As of this date the Petitioner has been confined to SHU for over two years. The government anticipates that this matter will take six months to try. Thus,

while providing defense counsel access to Petitioner is one part of preserving Petitioner's right to counsel, providing reasonably efficient and unburdensome access is another. The BOP should remain mindful that Petitioner's right to counsel can also be eroded when gaining access to Petitioner becomes so burdensome that it is negatively affecting his adequate representation. Additionally, the BOP must ensure that the right mechanism is in place to guarantee that all of Petitioner's administrative grievances and appeals are directed to the appropriate parties and dealt with accordingly.[6] Pointing fingers and delving into a he said/she said paradox, will not benefit either party in reaching the ultimate goal of trying this case in the most fair and expeditious manner possible. This Court requests that the BOP and defense counsel work closely and amicably together to ensure that during this short span of time prior to the trial's commencement, Petitioner and defense counsel are able to adequately prepare for trial.

### IV.   CONCLUSION

This Court finds that Petitioner has failed to make a sufficient showing that his pretrial administrative detention in SHU amounts to unconstitutional punishment. Rather, Respondent has adequately exhibited that the BOP's decision was driven by alternative legitimate and justifiable penological interests. Consequently, Petitioner has not displayed a substantial likelihood of success

---

[6]Despite numerous assurances to this Court by the BOP that Petitioner has been afforded access to the full range of administrative remedies allotted to detainees, there is no mechanism in place to adequately track the filing of such grievances. The BOP's retention of copies of all duly filed administrative complaints and appeals provides the BOP with their own internal record of what has been filed, but fails to provide any proof of submission to the prisoner. With no receipt or other record of filing the grievance, detainees do not have an effective means of proving that the complaints that they submit are actually filed. There is no reason to believe that the BOP or FDC-Miami would ever deliberately fail to file a complaint on behalf of a prisoner or mishandle the administrative grievances in any matter whatsoever. However, at the very least, detainees should be provided with some form of proof of filing, to provide them with the opportunity to substantiate their claims in the rare instances where claims are inadvertently misplaced or lost.

on the merits, and thus, has failed to adequately establish <u>Carillon's</u> first prong, necessary for a grant of preliminary injunction. Accordingly, for the reasons discussed herein it is hereby:

     **ORDERED AND ADJUDGED** that the Petitioner's Motion for Preliminary Injunction is **DENIED**.

     **DONE AND ORDERED** in Chambers at the United States District Courthouse in Miami-Dade County, Florida this 23rd day of October, 2006.

                                          */s/ Marcia G. Cooke*
                                          MARCIA G. COOKE
                                          United States District Judge

copies furnished to:   *All counsel of Record*